KRISTIN S. ESCALANTE, Cal. Bar No. 169635
Email: escalantek@sec.gov
MATTHEW T. MONTGOMERY, Cal. Bar No. 260149
Email: montgomerym@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
John W. Berry, Associate Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> JAY BELSON, SMARTE REAL ESTATE INVESTMENTS, INC., JACK ROCKMAN, LLC, JOHN BLACKSTONE, LLC, RESIDENCE AT ST. IVES, LLC, AND BELLAGIO PLACE RESIDENCE, LLC, <br><br> Defendants. | Case No. <br><br> **COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "SEC") alleges as follows:

## JURISDICTION

1.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa.

2.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mails, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

3.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendants reside in this district.

## SUMMARY

4.      This action involves the fraudulent offer and sale of securities by Jay Belson and several entities he controlled.  The securities were offered to finance the purchase, rehabilitation, and sale of residential real estate in Southern California.

5.      From at least January 2011 through June 2016, Belson and his entities raised at least $17,975,055 from at least 23 investors, promising investors that they would earn a minimum rate of return and share in the profits generated by the successful "flip" of properties.  Belson assured investors that the funds that they invested would be used only for expenses on the specific property in which they had invested, and that Belson and the entities would be paid only from the profits generated by the successful sale of the rehabilitated real property (and, in certain cases, through specifically identified development and management fees).

6.      Contrary to those representations, Belson misappropriated about $2.5 million in investor funds for his own personal use and for the use of unauthorized business expenses.  In addition, Belson misused investor funds by commingling them and using them to pay expenses on other properties for which funds were needed, rather than on the specific property that the funds were supposed to be used.  In April 2016, Belson expressly acknowledged to one investor that he had misused and misappropriated investor funds, admitting, for example, that he had "wrongfully spent and/or diverted at least $1,840,000 of [investor] funds for the benefit of other

projects managed by Jay Belson and/or his affiliates and personal expenses for Jay Belson."  In addition, Belson provided investors with return summaries that falsely inflated the returns the investor and relevant entity earned.  On occasion, Belson, through one or more of the entities he controlled, paid those inflated returns to investors to make it appear as if his enterprises were profitable and to encourage the investors to reinvest.

7.     By engaging in this conduct, Defendants violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder.  The SEC seeks disgorgement of Defendants' ill-gotten gains, prejudgment interest, and civil penalties.

## THE DEFENDANTS

8.     **Smarte Real Estate Investments, Inc.** ("Smarte") is a California corporation formed on January 13, 2011.  Its principal place of business is Beverly Hills, California.  Smarte is the sole member of Bellagio Place Management LLC, the manager of Bellagio Place Residence, LLC.

9.     **Bellagio Place Residence, LLC** ("Bellagio") is a California limited liability company formed on December 5, 2013.  Its principal place of business is 415 N. Crescent Drive, Suite 240, Beverly Hills, California, 90210.

10.     **Jack Rockman, LLC** ("Rockman") is a California limited liability company formed on December 12, 2009.  Its principal place of business is Beverly Hills, California.

11.     **John Blackstone, LLC** ("Blackstone") is a California limited liability company formed on September 27, 2011.  Its principal place of business is Beverly Hills, California.

12.     **Residence at St. Ives, LLC** ("St. Ives") is a California limited liability company formed on April 18, 2014.  Its principal place of business is 415 N. Crescent Drive, Suite 240, Beverly Hills, California, 90210.

13.     **Jay Belson**  ("Belson") resides in Los Angeles, California.  Belson is the

chief executive officer of Smarte, the president of Rockman, the managing member of Blackstone, and the manager of St. Ives.  Belson controls each of these entities.  In addition, Belson controls Bellagio through his control of Smarte.

## OTHER RELEVANT ENTITY

14.     **Tione Residence, LLC** ("Tione") is a California limited liability company formed on March 10, 2015.  Prior to April 22, 2016, Tione was managed by Palumbo/Belson Management, LLC, an entity Belson managed.

## DEFENDANTS' FRAUD

A.     **Solicitation of Investors Through False Representations Regarding The Use of Investor Proceeds**

15.     From January 2011 until June 2016, Belson raised about $17.9 million from 23 investors by offering and selling interests in loan agreements and notes issued by Smarte, Rockman, Blackstone, and St. Ives, and limited liability company interests in St. Ives, Bellagio, and Tione.

16.     Belson sold investments in those entities to investors referred by his friends, real estate colleagues, and existing or prior investors.  Belson often met with potential investors, as well as investors considering reinvesting, at the specific property to which their potential investments related.

17.     Defendants marketed and described the investments they were offering as "investments."  They maintained a website, www.sreinvesting.com, that stated: "We are Southern California's Premiere [sic] Luxury Investment and Development Company."  The website also invited potential investors to "learn how you can earn outstanding returns investing in our projects."

18.     Smarte, Rockman, Blackstone, St. Ives and Bellagio (the "Entity Defendants") are each named as Defendants in this case for their respective roles in the fraud.  As alleged, each was under the control of Belson during the relevant time, and remain so.  Only Tione is not named as a Defendant – Belson ceded control of Tione to its investors in April 2016 and no longer plays a role in its management.

### 1.   Loan Agreements and Notes Offered by Smarte, Rockman, Blackstone and St. Ives

19.   Four of the Entity Defendants (Smarte, Rockman, Blackstone, and St. Ives), through Belson, solicited investors to enter into loan agreements.  Although the terms varied slightly by entity, the agreements were generally consistent.

20.   Each loan agreement provided that the investor would provide "debt capital" to the entity "for use in the acquisition, repair, rehabilitation, and resale" of a property to be selected in accordance with the terms of the agreement.  No other permissible use of the funds was identified.

21.   The agreements provided that the entity would present "lending opportunities" to the investor in the form of "Exhibit A" to the agreement.  "Exhibit A" identified a specific residential real estate property and the date the property was acquired by the entity; the purchase price of the property; the entity's estimated cost to repair, rehabilitate, and/or remodel the property; the total acquisition cost of the property (which comprised the purchase price, estimated rehabilitation costs, and third-party acquisition costs); any senior liens on the property; the amount of money required from the investor; and the "profit participation" the investor would receive if the investor invested the required amount.

22.   For each investment made through a loan agreement, the Entity Defendant was obligated to issue a note and record a deed of trust.  Some notes were issued to investors for their loan agreements.  According to public records, only 32 deeds appear to have been recorded for the 67 loan agreements at issue.

23.   In return for the investment, the investor was promised a 12% per annum return on the outstanding principal balance of the loan, with principal balance and accrued interest to be paid within twelve months.  In addition to the loan interest, the investor was promised a "profit participation" in the "net proceeds" from the sale. The agreements contained a formula for calculating the percentage of the profits that the investor would receive, and specified the manner in which net proceeds would be

calculated.  The profit participation would be paid only if there were "net proceeds" available from the sale of the property, but the interest was to be paid regardless of any profit.

24.     The agreements further provided that the entity's compensation would come solely from the entity's share of the profits upon sale.  Specifically, the agreements stated:  "Other than [the entity's] receiving its share of Net Proceeds when a property is sold, [the entity] shall receive no additional compensation for providing such rehabilitation services."

25.     In addition to the written representations, Belson orally represented to investors that the investors' funds would be used only for the particular property identified in Exhibit A and that investor funds earmarked for a particular property would not be commingled with any other investor funds.  Belson further represented to investors that the entity's overhead costs would not be paid with investor funds; instead, those would be paid only with the entity's share of the net proceeds.

26.     Investors understood that their funds would be used only for the property in which they invested and that the Entity Defendants' overhead costs would not be paid with investor funds.

27.     The loan agreements acknowledged that the investors were passive and the entity at issue would be "solely responsible for overseeing and managing the repair, rehabilitation, and remodel services in connection with each property."

28.     Belson also orally confirmed this fact to investors.

29.     At least 23 different investors entered into at least 67 loan agreements, and invested at least $8,875,055 through Smarte, Rockman, Blackstone and St. Ives.

30.     All of the investors' funds were commingled, regardless of the project they invested in or the Entity Defendant they invested with.

31.     Under the terms of the agreements, after investor funds were deposited and agreement regarding a specific investment opportunity was reached, the Entity Defendant was supposed to deliver a promissory note secured by a deed of trust to the

investor.  In practice, however, Smart, Rockman, Blackstone and St. Ives did not issue notes or record deeds for every investment.  Out of the 67 loan agreements at issue, only 32 deeds were recorded, and approximately 16 notes were issued.  In the instances where the Entity Defendants issued notes, they reiterated and/or incorporated the "all terms and conditions set forth in" the corresponding loan agreements.

32.    Smarte, Rockman, and Blackstone offered and sold investments in several different properties each identified on a separate Exhibit A, while St. Ives offered and sold investments in a single property.

33.    For at least 11 of the projects associated with these four Entity Defendants, multiple investors had invested funds for the same underlying property.

### 2.    The LLC Interests Offered by St. Ives, Bellagio and Tione

34.    From 2015 to 2016, Belson offered and sold limited liability company interests in three entities – St. Ives, Bellagio and Tione (the "LLC Entities").  Each of the LLC Entities (two of which, St. Ives and Bellagio, are Entity Defendants) owned a single property and was managed Belson directly or through management companies he controlled.

35.    Each LLC Entity entered into limited liability company operating agreements ("LLC Agreements") and subscription agreements that described the terms and conditions of the investments.  Investors signed these agreements.  In addition, Bellagio and Tione provided investors with private placement memoranda that further described the investments.

36.    Investors who invested through the LLC Agreements thought they were investing in the LLC Entities as part of their investment.

37.    The LLC Agreement for Bellagio stated that a management company controlled by Smarte would manage Bellagio.  The LLC Agreement for Tione stated that a management company controlled by Belson would manage Tione.  The LLC Agreement for St. Ives stated that Belson would manage St. Ives.

7

38.    Belson and the Belson-controlled management companies of the LLC Entities  and the investors were all members of the LLC Entities, and thus, under the terms of the LLC Agreements, would share in any profits.  In fact, the LLC Agreements stated that the manager and the investors would share in any distributions from the LLC Entity that exceed the principal investment provided by the investors, plus a minimum interest on that investment.

39.    The LLC Agreements and (where applicable) the private placement memoranda made clear that investor funds were to be used solely to purchase, rehabilitate and sell the property the entity owned, and, in the case of Tione and Bellagio, to pay certain, specified management fees.  The St. Ives LLC Agreement defined St. Ives's "business" as "the acquisition, ownership, financing, management, maintenance, rehabilitation and disposition of certain real property located at 8931 St. Ives, Los Angeles, CA 90069."  Likewise, the Bellagio LLC Agreement stated that the purpose of that LLC Entity was to "own, finance, develop, sell, exchange and otherwise operate the Property," and its corresponding private placement memorandum stated that investor funds would be used "to acquire and develop the Property."  The Tione LLC Agreement stated that this LLC Entity was "formed to acquire, hold, demolish improvements, develop, sell, rent or otherwise deal with the Property," and its private placement memorandum stated that the LLC Entity would use investor proceeds "to acquire and redevelop the Property."  No other permissible use of funds was specified.

40.    Belson orally represented to investors that investor funds would not be used to fund the LLC Entities' overhead expenses.

41.    Investors understood that the funds invested in the LLC Entities would be used exclusively to purchase and rehabilitate the properties owned by that specific LLC Entity and that investor funds would not be used to fund the LLC Entities' overhead expenses.

42.    The documents specifically identified the compensation that Belson and

the Belson-controlled management companies would receive.  The documents represented that the LLC Entities would first use any profit generated from the sale of the property to repay their investors' principal plus a specified amount of interest, and then would share any remaining profit between the investors and Belson or the Belson-controlled management company that managed the LLC Entity.  In addition, for St. Ives and Tione, Belson and Tione's management company would receive $100,000 and $757,000, respectively, in development and acquisition fees.  Belson also orally told investors that he and the management companies of the LLC Entities would be paid from "the profits that were made from the project."  The investors understood that this would be the only compensation to which Belson or the management companies were entitled.

43.    A single investor invested $3,200,000 in Bellagio, $5,000,000 in Tione, and $800,000 in St. Ives through LLC Agreements and private placement memoranda.

44.    A separate investor invested $100,000 in Bellagio through an LLC Agreement and a private placement memorandum.

45.    The investors in the LLC Entities were passive and relied on the efforts of Belson and the LLC Entities for their returns.  The LLC Agreements for the LLC Entities each indicated that Belson or management companies he controlled would make all decisions concerning management, operation, and policy.

**B.    The Defendants' Fraudulent Conduct**

**1.    Defendants Misappropriated and Improperly Commingled Investor Funds**

46.    Instead of using investor funds for the purposes set forth in the offering documents, Defendants misappropriated about $2.5 million of investor funds. Contrary to the terms of the agreements, the funds were used to make unauthorized payments to Belson and improperly to cover certain operating costs, including, among other things, office rent, utilities and salaries.

47.    Specifically, from January 2011 through June 2016, Defendants misappropriated at least $2,498,960.  From July 2012 and June 2016, Defendants misappropriated at least $1,824,872.04.

48.    Defendants' misappropriation was eventually discovered by the largest investor, and Belson admitted to the misappropriation.  In March 2016, a large investor grew suspicious of Belson after he failed to pay the investor returns on the investor's St. Ives investment.  Concerned about his investments with the other Belson-controlled entities, the investor demanded and received access to the entities' bank and accounting records.  The investor analyzed some of the bank records and on April 6, 2016, confronted Belson by text, stating "But u [sic] basically took 2 million from Tione and I need to know why and what it went for ASAP."

49.    On April 9, 2016, after the investor accused Belson of "taking other people's money to support your life in hopes that we made a profit to make people whole, while putting everything in jeopardy […]," Belson responded "You're 100% right [….] i'm [sic] not sure how I got my attitude so twisted up on this."

50.    On April 12, 2016, Belson met with the investor and signed an Action by Unanimous Written Consent of the Manager of Tione, which stated that an entity managed by Belson "has wrongfully spent and/or diverted at least $1,840,000 of [Tione] funds for the benefit of other projects managed by Jay Belson and/or his affiliates and personal expenses for Jay Belson in contravention to the terms of [Tione's] Operating Agreement."

51.    That same day, Belson initiated a series of bank transfers, moving $245,000 from his and his wife's accounts to accounts in the names of two of his minor children.

52.    In late April 2016, Belson, at the request of the investor who discovered Belson's fraud, ceded control of Tione to its investors.  Thereafter, Belson played no role in Tione's management.

53.    Ultimately, in June of 2016, Defendants did not have sufficient funds to

10

continue operating, and were unable to complete at least three outstanding projects and repay the remaining investors' principal.

54.     Defendants also improperly commingled investor funds.  The offering materials specified that each investor's funds would be used to rehabilitate only the specific property associated with the investment.  But Defendants commingled investor funds and used them for any project for which funds were needed.  Smarte, Bellagio, Rockman, Blackstone and St. Ives acted through Belson in committing these acts.

55.     Belson and the Entity Defendants, at Belson's direction, transferred investor funds between accounts without any regard to where the funds came from, commingling the funds to such an extent that it was nearly impossible for Defendants to know which investors' funds were used to pay for particular expenses.

56.     Belson reviewed weekly reports that showed the activity in each bank account and directed an employee to transfer funds between accounts.

57.     Belson was a signatory on the bank accounts for each of the Entity Defendants and Tione.

58.     In a March 18, 2016 email chain, the same investor who discovered Defendants' fraud complained to Belson about his "taking money from one deal to feed another."  Belson replied, "You're certainly right about my mixing the project finances with each other…..bad choice."

59.     Defendants' representations concerning the intended use of investors' proceeds were materially false and misleading.  Rather than using investor funds exclusively to improve specific properties, as represented, Defendants used at least $2,498,960 to make unauthorized payments to Belson and improperly to cover their own non-property specific expenses.  Defendants also improperly commingled investor funds.

60.     The misrepresentations regarding the use of proceeds were material to investors because investors believed their funds would be used to improve the

specific properties in which they had invested, which would, in turn, generate returns for the investors.  Any reasonable investor would want to know whether his or her invested funds were being misappropriated or used for purposes other than represented, as they were here.

61.    In addition, Defendants falsely represented to investors that the projects were profitable, when, in fact, Defendants were not earning sufficient profits on the sale of properties to pay investor returns and cover their overhead expenses, including Belson's salary.

62.    These misrepresentations were also material to investors because investors wanted to invest in a profitable venture.  Any reasonable investor would want to know whether the projects in which he or she was ultimately investing were profitable or not.

### 2.    Belson Paid Inflated Returns To Induce Reinvestment

63.    When one of the entities sold a property, Belson purported to pay investors associated with that property their share of the purported profit generated by the sale.

64.    Belson and Smarte provided return summaries to each investor associated with a property that sold.  Smarte prepared and sent these summaries for all projects completed by Defendants, including for those entities with no formal relationship with Smarte.  The return summaries purported to show the expenses associated with the purchase, rehabilitation and sale of that property, the sale price, and the "total profit" generated by the sale of the property.

65.    The return summaries showed the "profit" paid to the investor and calculated the annual return on investment the investor realized.

66.    The return summaries also purported to show the "profit" due to the Defendants as a result of the sale.  Nearly every return summary Belson and Smarte provided to investors indicated that Defendants generated a "profit," even when Defendants lost money on the property in question.

67.     Belson often removed expenses that should have been included on the return summaries to make projects appear more profitable than they were. Defendants then paid the investors the inflated rate of return reflected on the falsified return summary.

68.     Based on the return summaries, investors believed Defendants were earning profits upon the sale of each of the properties.

69.     However, Defendants incurred losses on at least 17 of the 42 properties they managed and sold, not including the properties they failed to complete.

70.     The false representations in the return summaries were material to investors.  Any reasonable investor would want to know the true returns being earned or the true losses of a project.  In fact, believing Defendants were more profitable than they actually were, 13 of the 23 investors who invested with the Defendants did so on more than one occasion.

**C.     Defendants' Role in the Fraud**

71.     Belson controlled Smarte, Rockman, Blackstone, St. Ives, Bellagio and, until April 2016, Tione.

72.     Belson directed the creation of and approved the terms of the Loan Agreements, Notes, LLC Agreements and private placement memoranda, and knew their contents.

73.     Belson directed all banking activity for Smarte, Rockman, Blackstone, St. Ives, Bellagio and Tione by either writing checks, withdrawing funds, and transferring funds himself, or by directing an employee to write checks and transfer funds.

74.     At his request, Belson received and reviewed internal return summaries that showed the profit or loss Defendants generated from the sale of each project. Given his access to and control over these accounts and reports, Belson knew, or was reckless in not knowing, that investor funds were not used to improve specific properties as represented, but rather were used as needed for any property owned by

any of the entities he controlled.

75.    Indeed, Belson admitted in writing that he made a "bad choice" by "mixing project finances" and that he "wrongfully spent and/or diverted at least $1,840,000 of [Tione] funds for the benefit of other projects managed by Jay Belson and/or his affiliates and personal expenses for Jay Belson in contravention to the terms of [Tione's] Operating Agreement."

76.    Likewise, Belson knew, or was reckless in not knowing, that the investor-facing return summaries he directed be created and sent to investors falsely inflated their profits to obscure losses because the internal return summaries he used actually showed lower profits and, in many cases, losses.

77.    Because Belson controlled and managed Smarte, Rockman, Blackstone, St. Ives and Bellagio, his scienter is attributable to Smarte, Rockman, Blackstone, St. Ives and Bellagio.

## FIRST CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities

### Violations of Section 10(b) of the Exchange Act and

### Rule 10b-5(b) Thereunder

### (against all Defendants)

78.    The SEC realleges and incorporates by reference paragraphs 1 through 77 above.

79.    As alleged above, Defendants, and each of them, made material misrepresentations and omissions to investors and prospective investors regarding, among other things, the use of investor funds and the profitability of investments.

80.    By engaging in the conduct described above, Defendants, and each of them, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce or of the mails, with scienter, made untrue statements of a material fact or omitted to state a fact necessary in order to make the statements made, in the light of the circumstances under which they

were made, not misleading.

81.    By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

<u>**SECOND CLAIM FOR RELIEF**</u>

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and**

**Rules 10b-5(a) and 10b-5(c) Thereunder**

**(against all Defendants)**

82.    The SEC realleges and incorporates by reference paragraphs 1 through 77 above.

83.    As alleged above, Defendants, and each of them, engaged in a fraudulent scheme by misappropriating investor funds and commingling investor funds for improper use.  In furtherance of the scheme, Belson directed Smarte to create and issue false return summaries that falsely inflated the returns that the projects of Smarte and the other Defendants had made, and Defendants paid falsely inflated returns with improperly commingled funds to certain investors to encourage reinvestment.

84.    By engaging in the conduct described above, Defendants, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter, (a) employed devices, schemes or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

85.    By engaging in the conduct described above, Defendants, and each of them, violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b(c).

1

2

3

4

### THIRD CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**

**Violations of Section 17(a)(2) of the Securities Act**

**(against all Defendants)**

5   86.   The SEC realleges and incorporates by reference paragraphs 1 through 77

6   above.

7   87.   As alleged above, Defendants, and each of them, received money by

8   means of untrue statements and omissions regarding, among other things, the use of

9   investor funds and the profitability of investments.

10   88.   By engaging in the conduct described above, Defendants, and each of

11   them, directly or indirectly, in the offer or sale of securities, and by the use of means or

12   instruments of transportation or communication in interstate commerce or by use of the

13   mails, with scienter or negligently, obtained money or property by means of untrue

14   statements of material fact or by omitting to state a material fact necessary in order to

15   make the statements made, in light of the circumstances under which they were made,

16   not misleading.

17   89.   By engaging in the conduct described above, each of the defendants

18   violated, and unless enjoined will continue to violate, Section 17(a)(2) of the

19   Securities Act, 15 U.S.C. § 77q(a)(2).

20   ### FOURTH CLAIM FOR RELIEF

21   **Fraud in the Offer or Sale of Securities**

22   **Violations of Section 17(a)(1) and (3) of the Securities Act**

23   **(against all Defendants)**

24   90.   The SEC realleges and incorporates by reference paragraphs 1 through 77

25   above.

26   91.   As alleged above, Defendants, and each of them, engaged in a fraudulent

27   scheme by misappropriating investor funds and commingling investor funds for

28   improper use.  In furtherance of the scheme, Belson directed Smarte to create and issue

false return summaries that falsely inflated the returns that the projects of Smarte and the other Defendants had made and Defendants paid falsely inflated returns with improperly commingled funds to certain investors to encourage reinvestment.

92.     By engaging in the conduct described above, Defendants, and each of them, directly or indirectly, in the offer or sale of securities, and by the means or instruments of transportation or communication in interstate commerce or by use of the mails (a) with scienter, employed devices, schemes or artifices to defraud; and (b) with scienter or negligently, engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

93.     By engaging in the conduct described above, each of the defendants violated, and unless enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### **II.**

Issue orders, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendants and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5.

### **III.**

Issue an order, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Belson and his agents, servants, employees, and attorneys, and those

persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from, directly or indirectly, including, but not limited to, through any entity owned or controlled by Belson, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering by an issuer, provided, however, that such injunction shall not prevent Belson from purchasing or selling securities for his own personal account.

**IV.**

Order Defendants to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest thereon.

**V.**

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d) and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

**VI.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII**.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  August 10, 2017

*/s/ Kristin S. Escalante*
Kristin S. Escalante
Matthew T. Montgomery
Attorneys for Plaintiff
Securities and Exchange Commission